UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KATHERINE ADAMIDES, *et al.*,

                              Plaintiffs,                    DECISION AND ORDER

vs.
                                                            21-CV-6613 (CJS)
LOVELY ANN WARREN, *et al.*,

                              Defendants.

_____

Plaintiffs attended a protest near Martin Luther King, Jr. Memorial Park in Rochester, New York that began around 11:00 p.m. on July 15, 2020. Am. Compl., ¶ 61, Jan. 5, 2022, ECF No. 10. The protest was directed at Defendant Lovely Ann Warren, then Mayor of Rochester, and her "Local Emergency Order," which temporarily prohibited gatherings in groups of five or more persons in a public place between the hours of 11:00 p.m. and 5:00 a.m. Am. Compl. at ¶ 33, 61. Shortly after 2:00 a.m. on July 16, Plaintiffs were arrested by officers of the Rochester Police Department (RPD Defendants), after Plaintiffs failed to heed the RPD's recitations of the order and its calls to the crowd to disperse. Am. Compl. at ¶ 61–86.

Based on these events, Plaintiffs have filed the present action alleging multiple violations of First Amendment, Fourth Amendment, Due Process, and Equal Protection rights, as well as false arrest and malicious prosecution under federal and New York law, assault and battery, and violations of New York's "right to monitor" law. The matter is presently before the Court on Defendants' motion to dismiss the complaint for failure to state a claim upon which relief may be granted. Mot. to Dismiss, Feb. 9, 2022, ECF No. 13.

For the reasons stated below, Defendants' motion [ECF No. 13] is granted with respect to all federal claims, as well as the false arrest and malicious prosecution claims under New York state law. The Court declines to exercise supplemental jurisdiction with respect to the remaining state law claims for assault and battery, and violation of Plaintiffs' "right to monitor" under New York Civil Rights Law § 79-P. The Clerk of Court is directed to close this case.

BACKGROUND

Daniel Prude

Although their complaint alleges misconduct that occurred on the night of July 15, 2020, Plaintiffs have hitched the success of the present action to the arrest and subsequent death of Daniel Prude four months earlier. Briefly, on the evening of March 23, 2020, Prude's family sought assistance from the Rochester Police Department (RPD) in dealing with an "acute mental health crisis" that Prude was experiencing at that time. Am. Compl. at ¶ 27. In the course of effecting a "mental health arrest" on Prude, the RPD forcibly restrained him and employed a "spit hood."[1] Prude asphyxiated while in the spit hood, and had to be transported to the local hospital, where he was declared brain dead. *Id*. He died one week later, on March 30, 2020. *Id*. In February 2021, after hearing evidence over nine sessions, a grand jury voted not to indict any of the RPD officers involved on charges related to Prude's death. *See Attorney General James Releases Statement on Grand Jury Decision Regarding the Death of Daniel Prude*, Feb. 23, 2021,

---

[1] *See Final Report of the Independent Investigation of the City of Rochester's Response to the Death of Daniel Prude*, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, available at https://ecbawm.com/report-released-in-the-investigation-of-the-city-of-rochesters-response-to-the-death-of-daniel-prude/ (last accessed July 12, 2022) (incorporated by reference into the amended complaint.

https://ag.ny.gov/press-release/2021/attorney-general-james-releases-statement-grand-

jury-decision-regarding-death (last visited July 5, 2022).

Following Prude's death, his family sought to view a copy of the the RPD officers'

body worn camera recordings that captured Prude's arrest (the "Prude footage"). As

Plaintiffs explain in the amended complaint:

> 28. On April 3, 2020, [Daniel Prude's brother,] Joe Prude, through counsel, submitted a request for the ["Prude footage"] under the Freedom of Information Law. When the City ignored the request, an agency appeal was submitted on May 28, 2020, and the City was legally required to release the video to Joe Prude and his counsel within 10 business days.

> 29. When RPD officials learned that it would have to release video of its officers killing Daniel Prude, they immediately took steps to suppress the video. On June 4, 2020, RPD Deputy Chief Mark Simmons wrote an email to Chief of Police La'Ron Singletary in which he stated, "We certainly do not want people to misinterpret the officers' actions and conflate this incident with any recent killings of unarmed black men by law enforcement nationally. That would simply be a false narrative, and could create animosity and potentially violent blow back in this community as a result. I ask that we reach out to Corporation Council and ask them to deny the request based on the fact that the case is still active, as it is currently being investigated for possible criminal charges to be brought forth by the AG's office."

> 30. Chief Singletary responded, "I totally agree. If you can set up a zoom meeting with Pat[rick Beath] and/or Tim [Curtin]."

> 31. In a June 5, 2020 meeting, senior RPD officials, including Chief Singletary, advocated with former Corporation Counsel Tim Curtin and Deputy Corporation Counsel Patrick Beath to delay release of the [Prude footage], based on concerns that disclosure could spark civil unrest or violence amidst demonstrations then occurring over the death of George Floyd.

> 32. Concerns about the public reaction to the [Prude] footage were not a lawful basis to deny release of the [Prude] footage under FOIL.

> 33. Upon information and belief, following the June 5 meeting, the City and Mayor Warren immediately drafted the Emergency Order that went into

effect on July 15, 2020 (the "Curfew"), which purported to make it a class B misdemeanor to "gather in groups of five or more in a public place in the City of Rochester" between the hours of 11:00 p.m. and 5:00 a.m.

Am. Compl. at ¶ 28–33.

<u>The Emergency Order</u>

At the time of the events alleged in the amended complaint, Defendant Lovely Ann Warren was the duly elected Mayor of the City of Rochester ("Mayor Warren"), and author of the "Local Emergency Order" ("Emergency Order") that was the subject of the protest on the night of July 15–16, 2020. Am. Compl. at ¶ 21. Although Plaintiffs do not include the full text of the Emergency Order in their papers, the order is at the heart of their amended complaint,[2] and Defendants have included a copy in their submissions.

The Emergency Order invokes the ongoing global, national, statewide, and local states of emergency caused by the COVID-19 pandemic, and states in pertinent part:

> WHEREAS, throughout the summer months of 2020, and increasingly during the month of July, groups of individuals in the City of Rochester are gathering both indoors and outdoors in public places, without face masks and without social distancing as required by the Governor's Executive Orders, in particular during the late-night and early morning hours, increasing the risk of transmission and community spread of the virus;
>
> NOW, THEREFORE, effective 12:01 am on July 15, 2020, pursuant to the powers granted to me by New York State Executive Law Section 24, and in order to adequately protect life and property and to bring the emergency situation under control it is hereby
>
> * * *
>
> ORDERED that, between the hours of 11:00 p.m. and 5:00 a.m., it shall be unlawful to gather in groups of five or more in a public place in the City of

---

[2] In adjudicating a motion to dismiss, the Court recognizes that it may consider only the complaint, any written instrument attached to the complaint as an exhibit, any document that is integral to the complaint, and any statements or documents incorporated by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

Rochester. For purposes of this clause, a public place includes any outdoor premises or other area that is open to the public, including but not limited to streets, sidewalks, parks, parking lots, vacant lots and any unused or unimproved land. Violation of this clause shall be a class B misdemeanor in accordance with Executive Law § 24(5) . . . .

Mot. to Dismiss (Ex. D), Feb. 9, 2022, ECF No. 13-5. In addition to the prohibition on gathering in groups of five or more in a public place between 11:00 p.m. and 5:00 a.m., the order also prohibited gathering in groups of ten or more unrelated individuals during the same time period inside any location or premises not licensed under the Alcoholic Beverage Control Law, temporarily limited access to City of Rochester facilities generally, exempted city officials from statutorily-required "in person" attendance of meetings of city bodies or boards, postponed zoning board meetings, suspended particular provisions of the zoning code and noise ordinances to facilitate the expansion outdoor dining at city restaurants, authorized the city clerk to execute statements of domestic partnerships remotely, and allowed virtual hearings for parking violations. *Id.*

The Events of July 15, 2020

The Emergency Order went into effect at 12:01 a.m. on July 15, 2020. At approximately 11:00 p.m. that night, Plaintiffs gathered in the vicinity of Martin Luther King, Jr. Memorial Park to protest the Emergency Order. Am. Compl at ¶ 62. After a peaceful march around the downtown area accompanied by a police escort, the protesters returned to the sidewalk outside the park at about 12:30 a.m. Am. Compl at ¶ 63. Around 1:30 a.m., 19 Rochester Police Department (RPD) officers assembled on the street in front of the protesters, began continuously reading the emergency order over the loudspeaker, and warned the protesters that they would be arrested if they did not

disperse. Am. Compl. at ¶ 66–69.

At 1:40 a.m., 20 additional RPD officers approached the protesters from the rear. Am. Compl. at ¶ 71. The first protester was arrested at 1:44 a.m. Am. Compl. at ¶ 71. At 2:16 a.m., the RPD issued another warning to the protesters that they must disperse or be arrested. Am. Compl. at ¶ 72. When Plaintiffs did not disperse, they were surrounded and arrested one-by-one by the RPD Defendants.

Prior to being put into one of three transport vans used by the RPD on this occasion, Plaintiffs' masks were removed so that they could be photographed. Am. Compl. at ¶ 78. In several instances, the RPD Defendants did not put Plaintiffs' masks back on following the photographs. Am. Compl. at ¶ 78. Plaintiffs were then placed into the transport vans with other arrestees – several of whom were unmasked – for between 30 and 60 minutes before being taken to a nearby police station. Am. Compl. at ¶ 79. Once at the police station, Plaintiffs were questioned, issued appearance tickets charging them with violations of the Emergency Order, and released. Am. Compl. at ¶ 82.

<u>The Instant Case</u>

Based on these events, Plaintiffs timely filed Notices of Claim against the City in compliance with New York General Municipal Law § 50. Am. Compl. at ¶ 14. The City waived a § 50-h hearing for nearly all Plaintiffs, and declined to pay or adjust the claims. Am. Compl. at ¶ 15–16. Plaintiffs then filed the present action against Defendants, listing fifteen causes of action: (1) municipal liability under 42 U.S.C. § 1983; (2) violation of the First and Fourteenth Amendment; (3) violation of the First Amendment (including retaliation and selective enforcement); (4) unlawful seizure / false arrest (§ 1983); (5) false

arrest (New York state law); (6) malicious prosecution (§ 1983); (7) malicious prosecution (New York state law); (8) violation of the First, Fourth, Fifth, and Fourteenth Amendments; (9) false imprisonment / conditions of confinement (§ 1983); (10) due process violations; (11) equal protection violations; (12) vagueness (§ 1983); (13) declaration of rights (28 U.S.C. § 2201); (14) assault and battery (New York state law); and (15) violation of New York's "right to monitor" act.

The matter is presently before the Court on Defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief may be granted. Mot. to Dismiss, Feb. 9, 2022, ECF No. 13.

LEGAL STANDARD

It is well-settled that the purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "is to test . . . the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis omitted). The court must draw all reasonable inferences in the plaintiff's favor and accept all factual allegations in the complaint as true, but need not attach any weight to legal conclusions and conclusory statements. *See Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009).

An action must be dismissed under Rule 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). To survive a motion to dismiss under Rule 12(b)(6), on the other hand, "a complaint must contain sufficient factual matter, accepted

7

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where a plaintiff's factual allegations are "merely consistent with" a defendant's liability, those allegations "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (citation and internal quotation marks omitted).

DISCUSSION

Defendants present multiple arguments in support of their motion to dismiss. They maintain that: (1) Plaintiffs do not have standing to seek declaratory relief; (2) the claims for relief alleging generalized municipal liability and assault and battery do not identify a factual predicate; (3) Plaintiffs' First Amendment claims fail as a matter of law; (4) the false arrest and malicious prosecution claims are precluded by the RPD Defendants' probable cause to arrest protesters who disobeyed the emergency orders; (5) the conditions of confinement claim fails to satisfy either the objective or the subjective prongs of the inquiry; (6) the emergency order was not unduly vague; (7) the equal protection claim is legally insufficient; and (8) the violation of N.Y. Civil Rights Law § 79-p claim fails to allege that Plaintiffs were arrested for protected activity. For ease of discussion, the Court addresses Defendants' arguments out of order.

8

First Amendment Claims

In their second, third and eighth claims for relief, Plaintiffs argue that Mayor Warren's Emergency Order, and the RPD Defendants' enforcement of that order, constituted violations of their First, Fourth, Fifth and Fourteenth Amendment rights. Plaintiffs allege that the Emergency Order fails "strict scrutiny" because it was "viewpoint discriminatory . . . unnecessary, and not precisely tailored to serve compelling government interests" (Am. Compl. at ¶ 371(a)), and that it fails "intermediate scrutiny" because it "lacked narrow tailoring to serve a significant governmental interest" (Compl. at ¶ 371(b)). Additionally, Plaintiffs maintain that they have adequately pled a retaliatory arrest claim against the RPD Defendants under *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018). Mem. in Opp. at 18; Am. Compl. at ¶ 363, 365. The Court finds that all three facets of Plaintiffs' First Amendment claims – viewpoint discrimination, scope of the restrictions, and retaliation – are without merit.

*Viewpoint Discrimination*

The central theory animating Plaintiffs' compliant is that the July 15, 2020 Emergency Order "was simply a pretextual justification for suppressing lawful public demonstrations when the video of [Rochester Police Department] officers killing Daniel Prude was released publicly . . . ." Mem. in Opp. at 4; *see also* Am. Compl. at ¶ 361 (alleging that the Emergency Order "was drafted and implemented for the purpose of suppressing lawful protests that were anticipated when the [Prude footage] became public."). Thus, Plaintiffs maintain that the order was drafted "without lawful justification to deprive Plaintiffs of their rights to speech, expression and to assemble in violation of the

9

First, Fifth, and Fourteenth Amendments to the United States [Constitution]." Am. Compl. at ¶ 354. Defendants argue that Plaintiffs' allegations in this regard are baseless, and that the order and the "gathering limitations therein further a substantial government interest: the promotion of public health and safety by reducing the spread of COVID-19 and reducing gun violence." Mem. in Support at 12.

To be sure, the First Amendment, as incorporated through the Fourteenth Amendment, prohibits a state from abridging the freedom of speech, or the right of the people to peaceably assemble. *See, e.g., Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017). Consistent with the traditionally open character of public streets and sidewalks, the Supreme Court has "held that the government's ability to restrict speech in such locations is 'very limited.'" *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (citation omitted). In such traditional public fora, "the guiding First Amendment principle that the 'government has no power to restrict expression because of its message, its ideas, its subject matter, or its content applies with full force' . . . ." *Id.* (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

Another court in this District recently summarized First Amendment law as it relates to viewpoint discrimination:

> Government "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "Viewpoint discrimination is a subset or particular instance of the more general phenomenon of content discrimination, in which the government targets not subject matter but particular views taken by speakers on a subject." *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 150 (2d Cir. 2004) (quoting another source). The government discriminates against viewpoints when it disfavors certain speech because of "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.

*Hilderbrant* v. *City of Rochester, et al.*, No. 21-CV-6714-FPG, 2022 WL 2356701, at *7 (W.D.N.Y. June 30, 2022).

In the amended complaint, Plaintiffs make much of the June 4th and 5th communications of RPD Chief La'Ron Singletary and RPD Deputy Chief Mark Simmons with each other, and then with City of Rochester attorneys Patrick Beath and Tim Curtin. The Court accepts as true both that the alleged communications regarding the Prude footage between senior RPD officials and city attorneys occurred, and that the content of the communications included expressions of concern about potential civil unrest if the footage was released. Even taking those allegations to be true, however, the Court finds that Plaintiffs have failed to plausibly allege that the July 15 Emergency Order was simply "a pretextual justification for suppressing lawful public demonstrations when the video of RPD officers killing Daniel Prude was release[d] publicly . . . ." Am. Compl. at ¶ 41 (footnote omitted). There are four primary reasons the Court finds Plaintiffs' theory implausible. *See also* Def.'s Reply, 2–4, Mar. 25, 2022, ECF No. 16.

First, the Emergency Order does not draw a content-based distinction on its face. It prohibits *all* gatherings of groups of five or more in public places, not gatherings of groups with particular messages. *See* Mot. to Dismiss (Ex. D). The Act would be content-based if it required "enforcement authorities" to "examine the content of the message that is conveyed to determine whether" a violation has occurred. *McCullen*, 573 U.S. at 479 (citation omitted). But it does not. Whether petitioners violate the order depends not on "what they say," but on when, where, and with how many people they say it. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010).

11

Second, the Emergency Order provides an express and reasonable justification[3] for the restrictions that it imposes: a growing number of "groups of individuals in the City of Rochester . . . gathering both indoors and outdoors in public places, without face masks and without social distancing . . . in particular during the late-night and early morning hours, increasing the risk of transmission and community spread of the virus . . . ." Mot. to Dismiss (Ex. D). This reasoning was consistent with Mayor Warren's original "Proclamation of a Local State of Emergency" in the City of Rochester, which was issued on March 16, 2020 – one week before Prude's arrest – and declared a local state of emergency based on the threat that COVID-19 poses to the health and welfare of the City of Rochester's residents and visitors. *See* Mot. to Dismiss (Ex. C), Feb. 9, 2022, ECF No. 13-4. In short, on its face the order served purposes unrelated to the content of expression. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (finding that when determining content neutrality, "[t]he government's purpose is the controlling consideration.). *See also Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 150 (2d Cir. 2005) ("a regulation that targets only potentially harmful secondary effects of speech, rather than the contents of the speech itself . . . is deemed content-neutral).

In this regard, Plaintiffs' multiple assertions that "there [was] no public health

---

[3] Defendants also maintain that the order was justified to counteract an increase of gun violence in the city. To that end, Defendants submit the affidavit of Fabian Rivera, a Commander with the RPD in charge of the Patrol Division. Mot. to Dismiss (Ex. 11), Feb. 9, 2022, ECF No. 13-11. Defendants had previously submitted this affidavit in a separate action seeking an injunction against enforcement of the Emergency Order. *See, e.g., Martin v. Warren*, 482 F. Supp.3d 51, 56 (W.D.N.Y. 2020) (recounting Rivera's statement regarding a gunfight in the area of Chili Avenue and Post Avenue on July 5, 2020). The Court declines to consider Commander Rivera's affidavit at this time – as well as Defendants' assertion that part of the purpose of the order was to decrease opportunities for gun violence – because those issues go to a factual dispute regarding the substance of Plaintiffs' claims, rather than the formal sufficiency of Plaintiffs' complaint.

justification for Mayor Warren's Emergency Order" are conclusory assertions, not factual allegations that the Court is compelled to accept as true. Am. Compl. at ¶ 41. In an attempt to demonstrate the unreasonableness of the measures implemented through the Emergency Order, Plaintiffs state that public health officials have shown that the odds of catching COVID-19 are much greater indoors than outdoors (Am. Compl. at ¶ 42), that open spaces prevent COVID-19 from spreading (Am. Compl. at ¶ 43), and that bars are among the riskiest places for the spread of COVID-19 (Am. Compl. at ¶ 46). However, as Justice Roberts of the Supreme Court pointed out approximately one month before the Emergency Order was issued, most of what was commonly known of COVID-19 at the time was that it is "a novel severe acute respiratory illness that has killed . . . more than 100,000 [people] nationwide." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, J. concurring). There was "no known cure, no effective treatment, and no vaccine. [And b]ecause people may be infected but asymptomatic, they may unwittingly infect others." *Id.*

Third, the measures instituted by the Emergency Order were consistent with the order's stated purpose, not with viewpoint discrimination. As noted, in addition to imposing restrictions on late-night gatherings, the order limited public access to city facilities, temporarily suspended the "in-person attendance" requirement for public officers at public meetings, cancelled zoning board meetings, temporarily suspended noise ordinance restrictions, authorized the city clerk's office to execute statements of domestic partnership remotely, and allowed remote hearings for parking violations. These measures all fit with the order's stated justification of protecting the public from COVID-

19, and do not in any way support the inference that the order was a pretext for the suppression of protests that city officials expected to follow the release of the Prude footage. Further, the restrictions are consistent with similar measures taken by other cities around New York State. *See, e.g., Butler v. City of New York*, 559 F. Supp.3d 253, 261 (S.D.N.Y. 2021) (challenging New York City Mayor Bill de Blasio's Emergency Executive Order 103, which restricted gatherings "[i]n order to avoid the mass congregation of people in public places and to reduce the opportunity for the spread of COVID-19 . . . .").

Lastly, Plaintiffs have failed to render a plausible account of the discrepancy in the timing of the communications between the senior RPD officials and city attorneys regarding the Prude footage, and the proclamation of the Emergency Order. According to the Amended Complaint, Prude's family first requested the Prude footage on April 3, 2020 (Am. Compl. at ¶ 28); an agency appeal was submitted on May 28 (Am. Compl. at ¶ 28); the communication between RPD Chief La'Ron Singletary and RPD Deputy Chief Mark Simmons occurred on June 4 (Am. Compl. at ¶ 29); and the communications – including a meeting – between RPD officials and city attorneys Beath and Curtin occurred on June 5 (Am. Compl. at ¶ 31). Yet the Emergency Order was not issued until July 15 (Am. Compl. at ¶ 33), more than one month after the meeting between the RPD officials and city attorneys. Additionally, the Prude footage was not released to the Prude family until August 12, and then not to the public until September 2.[4] Plaintiffs allege that "following the June 5 meeting, the City and Mayor Warren immediately drafted the

---

[4] The dates of release of the Prude footage were not taken directly from Plaintiffs' pleadings, but rather from paragraphs 59 and 64, respectively, of the "Final Report of the Independent Investigation of the City of Rochester's Response to the Death of Daniel Prude," which Plaintiffs incorporated by reference in their amended complaint at ¶ 32.

Emergency Order that went into effect on July 15, 2020" (Am. Compl. at ¶ 33), but they provide no plausible explanation for why the order was "immediately drafted" in early June but not proclaimed until mid-July, and then the Prude footage not released until mid-August.

Accordingly, the Court finds that Plaintiffs' allegation that the COVID-19 pandemic was merely a "pretext" for the Emergency Order, which was really aimed at suppressing protests over the Prude footage, is not plausible. Plaintiffs' claims of viewpoint discrimination are without merit.

*Scope of the Restrictions*

In addition to viewpoint discrimination, Plaintiffs also challenge the scope of the restrictions imposed by the Emergency Order. They maintain that the restrictions are so broad that they could not stand up to either strict or intermediate scrutiny. Am. Compl. at ¶ 371. Defendants counter that the regulations are justified under the four-part test set forth in *United States v. O'Brien*, 391 U.S. 367 (1968). Mem. in Supp. at 13–14. The Court finds that the scope of the regulations are justified under both the *O'Brien* standard, as well as the "the modern constitutional jurisprudence of tiers of scrutiny" framework utilized by Plaintiffs. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020).

In *O'Brien*, the Supreme Court held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376. The *O'Brien* court identified four elements for determining whether a regulation is sufficiently justified: (1) it is within the

constitutional power of the Government; (2) it furthers an important or substantial government interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377.

Under the "tiers of scrutiny" framework, the Supreme Court has held that "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (internal quotation marks and citation omitted). Under the intermediate standard employed in cases in which the regulation is content neutral, as it is in this case, "narrowly tailored" does not require a regulation to be the "least restrictive or least intrusive" means. *Marcavage v. City of New York*, 689 F.3d 98 104 (2d Cir. 2012). Rather, the regulation is "narrowly tailored so long as it . . . promotes a substantial government interest that would be achieved less effectively absent the regulation and is not substantially broader than necessary." *Marcavage*, 689 F.3d at 106 (internal quotation marks and citation omitted).

The measures instituted under the Emergency Order pass muster under either the *O'Brien* standard or intermediate scrutiny. To begin with, "[s]temming the spread of COVID–19 is unquestionably a compelling interest . . . ." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). In serving this compelling interest, Mayor Warren and the City of Rochester zeroed in on the cause (large late-night gatherings)

and narrowly tailored the order to address that cause (prohibiting late-night gatherings in public places). First, although the severity of the pandemic led to an extension of the prohibition for a matter of months, conditions had to be evaluated and the order renewed every five days. Second, at its most restrictive, the prohibition on public gatherings was in effect for no more than six hours each night, leaving eighteen hours per day in which the curfew was not in effect and in which protesters, journalists, and legal observers were not restricted from exercising their First Amendment rights. *Jeffery v. City of New York*, No. 20CV2843NGGRML, 2022 WL 204233, at *7 (E.D.N.Y. Jan. 24, 2022). Lastly, the measure left open ample alternative channels to communicate at any hour, such as videoconference, telephone, blogging, email, print media, radio, etc.

*Retaliation*

Finally, the Court notes that Plaintiffs maintain that their First Amendment retaliation claim must go forward because Defendants failed to contest the retaliation claim in the memorandum supporting their motion to dismiss. Mem. in Opp. at 16–17. The Court disagrees. Although Defendants do not offer legal argument challenging the retaliation claim in their original memorandum, they nevertheless attack the factual basis of the claim with respect to both the Plaintiffs who allege they were retaliated against for protesting ("Protesting Plaintiffs"), and those who allege they were retaliated against for recording RPD officers' conduct ("Recording Plaintiffs")[5] at the protest. Specifically, with

---

[5] The category of Recording Plaintiffs includes Plaintiffs Katherine Adamides, Brendan Boehner, Ryan Mullaney, and – though not listed in the caption or on the docket – Michael Sportiello, each of whom "attended the July 15–16 protest in his [or her] capacity as a NLG Legal Observer[s].™" See, e.g., Am. Compl. at ¶ 312 (Plaintiff Michael Sportiello). The category also includes Plaintiff Darien Lamen, who "attended the July 15–16 protest in his capacity as a professional photojournalist." Am. Compl. at ¶ 228. The allegations in the amended complaint, accepted as true, establish that "at no time" were any of the Recording Plaintiffs "standing with a 'group' of other people," or "'participating'" in the protest. See, e.g.,

respect to the Protesting Plaintiffs, Defendants argue that they "were ultimately arrested for violation of the Emergency Order," not retaliation. *See, e.g.,* Mem. in Supp. at 4.  With respect to the Recording Plaintiffs, Defendants similarly argue that "[t]he complaint fails to provide <u>any</u> facts that any police officer effected an arrest or took any other action against any of the plaintiffs because of recording activity, rather than because each of the plaintiffs had committed a Class B misdemeanor by violating the Emergency Order's restrictions." Mem. in Supp. at 25. After a careful review of the amended complaint, the Court agrees with Defendants.

To begin with, the Court's finding that Plaintiffs' have failed to plausibly allege that the COVID-19 pandemic was a "pretext" for suppressing potential protests of RPD conduct in the arrest of Daniel Prude requires the further conclusion that the Protesting Plaintiffs have not adequately pled a retaliatory arrest claim. *See, e.g.,* Mem. in Opp. at 18 ("The entire thrust of Plaintiff[s'] First Amendment Retaliation claim is that the [emergency order] was implemented to retaliate against protesters and suppress Black Lives Matter protests that the City knew would occur when the video of Daniel Prude's murder was eventually release[d]."). As Plaintiffs rightly note, "[t]o plead a First Amendment retaliation claim a plaintiff must show: (1) [plaintiff] has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) the defendant's actions caused [plaintiff] some

---

Am. Compl. at ¶ 127–31 (Plaintiff Brendan Boehner). Each of the Recording Plaintiffs was at some point removed from the "kettle" configuration which RPD Defendants had formed around the protest and "escorted" by particular RPD Defendants to waiting RPD vehicles. See, e.g., Am. Compl. at ¶ 304 (Plaintiff Ryan Mullaney). Recording Plaintiffs allege that they were "essential workers" not subject to the Emergency Order. *See, e.g.,* Am. Compl. at ¶ 93. They provide no reasoning, and cite to no legal authority to support this legal conclusion.

injury." Mem. in Opp. at 17 (quoting *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)). Because Protesting Plaintiffs have failed to plausibly plead that the Emergency Order unlawfully restricted their First Amendment rights of free speech or free assembly, their allegations fail to satisfy the first or second elements of retaliatory arrest, and their claim is legally insufficient. The Supreme Court's ruling in *Lozman*, then, which found that the existence of probable cause for the arrest does not bar a First Amendment retaliation claim, is inapposite. *Lozman*, 138 S. Ct. at 1955.

The First Amendment retaliation claims by the Recording Plaintiffs are also without merit. In particular, the Recording Plaintiffs fail to adequately allege that the conduct prompting their arrest was protected by the First Amendment.[6]

"Neither the Supreme Court nor Second Circuit precedent has squarely established that an individual who is the subject of police activity has the right to record police performing their official duties." *Picard v. Torneo*, 2019 WL 4931353, at *4 (D. Conn. 2019). However, "[a]ll of the circuit courts that have [addressed the issue] . . . have concluded that the First Amendment protects the right to record police officers performing their duties in a public space, subject to reasonable time, place and manner restrictions."

---

[6] In addition, Recording Plaintiff Adamides' allegations that she was arrested because she was a legal observer do not establish a retaliatory arrest claim. Am. Compl. at ¶ 88. Adamides alleges that she was prevented from leaving the "kettle" at 2:18 a.m. by an RPD Defendant who was instructed by a commanding officer that "she stays in." Am. Compl. at ¶ 94. Her allegation that she was placed under arrest because she was a legal observer in this regard is conclusory. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citations omitted) ("To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury' . . . ."). Indeed, the details of Plaintiff Adamides' arrest are consistent with – if not identical to – what occurred to the Protester Plaintiffs: she was taken to an RPD vehicle with the other individuals who had been arrested, transported to the local police station, charged, and released. *Compare* Am. Compl. at ¶ 95–101 (Recording Plaintiff Adamides) with Am. Compl. at ¶ 103–14 (Protesting Plaintiff Adams).

*Higginbotham v. City of New York*, 105 F. Supp.3d 369, 379 (S.D.N.Y. 2015), *aff'd*, 741 F. App'x 28 (2d. Cir. 2018) (citing First, Seventh, Ninth, and Eleventh Circuit cases).

As indicated above, the time, place, and manner restrictions of the Emergency Order passed muster under both the *O'Brien* standard and intermediate scrutiny. Hence, even assuming their right to observe, document, photograph and record police activity, the restrictions on that right imposed by the emergency order and the police announcements that night were permissible under the circumstances alleged. *See, e.g., Leibovitz v. City of New York*, No. 14-CV-7106(KAM)(LB), 2018 WL 1157872, at *8 (E.D.N.Y. Mar. 2, 2018) (dismissing the claim where plaintiff persisted in conduct that was interfering with a police investigation, even after repeated warnings and request to maintain greater distance). After over two hours of a gathering in violation of the Emergency Order, RPD Defendants provided reasonable notice to the protesters that they were in violation of the Emergency Order and must disperse by "continuously reading" the Emergency Order over the loudspeaker beginning at approximately 1:28 a.m. (Am. Compl. at ¶ 68), "announcing" at approximately 1:30 a.m. "that if the group did not disperse they would be arrested for violating the curfew" (Am. Compl. at ¶ 69), and issuing a "three-minute warning to disperse or be arrested" at approximately 2:16 a.m. (Am. Compl. at ¶ 72). These measures served as a justified and narrow restriction on the manner in which the Recording Plaintiffs could exercise their asserted First Amendment rights. *See, e.g., Leibovitz*, 2018 WL 1157872 at *9.

For all of the foregoing reasons, Plaintiffs' second, third  and eighth claims must be dismissed.

20

<u>False Arrest / Unlawful Seizure</u>

In their fourth and fifth claims for relief, Plaintiffs allege causes of action for unlawful seizure and false arrest under both federal and state law. Plaintiffs allege that "[t]he individual Defendants seized and arrested Plaintiffs despite knowing that the [Emergency Order] was unlawful and that probable cause did not exist to seize and arrest Plaintiffs for any crime." Am. Compl. at ¶ 377. The Court concludes that Plaintiffs' claims for false arrest are legally insufficient, and must be dismissed.

The elements of a false arrest claim under § 1983 are essentially the same as the elements of a false arrest claim under New York state law. *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992) "[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizure, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). To establish a § 1983 claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). Because the existence of probable cause makes a confinement privileged, "[p]robable cause is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)).

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has

21

committed . . . a crime." *Jaegly*, 439 F.3d at 152 (quotation omitted). "A court 'must consider [only] those facts available to the officer at the time of the arrest and immediately before it.'" *Stansbury*, 721 F.3d at 89 (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). In the state of New York, "[a]n assessment of probable cause becomes easier in the scenario of a direct observation of a legal infraction," because N.Y. Crim. Proc. Law § 140.10(1)(a) provides, in pertinent part, that "a police officer may arrest a person for [a]ny offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence." *Clay v. Riordan*, No. 18-CV-933 (LJV), 2020 WL 3893809, at *4 (W.D.N.Y. July 10, 2020), *report and recommendation adopted*, No. 18-CV-00933, 2020 WL 4474160 (W.D.N.Y. Aug. 4, 2020) (citation omitted).

Plaintiffs' false arrest claims are predicated on the theory that Mayor Warren's Emergency Order was unlawful. It was not. Plaintiffs' "attend[ance of] the protest on the night of July 15–16, 2020" (Am. Compl. at ¶ 61) – whether in the capacity of a protester or as a legal observer – was therefore prohibited. See Mot. to Dimiss (Ex. D). Not only were Plaintiffs given notice of this fact with the Mayor's original proclamation of the Emergency Order, but they were informed on the scene by the RPD Defendants at 1:28 a.m. (Am. Compl. at ¶ 28) and again at 2:16 a.m. (Am. Compl. at ¶ 72), yet Plaintiffs failed to disperse. *See, e.g., Dinler v. City of New York*, No. 04 CIV. 7921 RJS JCF, 2012 WL 4513352, at *6 (S.D.N.Y. Sept. 30, 2012) (noting "that police efforts to sort lawbreakers from bystanders, and to advise the latter that they should leave, are highly probative of whether it would be reasonable to conclude that every person arrested violated the law.").

Because Defendants had probable cause to arrest Plaintiffs, Plaintiffs fail to show that their confinement was not privileged, and the false arrest claims must be dismissed as legally insufficient. *Butler*, 559 F. Supp.3d at 272–73.

Malicious Prosecution

Plaintiffs' sixth and seventh causes of action assert malicious prosecution claims against Defendants under state and federal law. Compl. at ¶¶ 399-417. "[I]n recognizing a malicious prosecution claim when the prosecution depends on a violation of federal rights, [§ 1983] adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (citation omitted). Accordingly, where New York is the forum state, a plaintiff alleging a claim for malicious prosecution under § 1983 and state law must allege four elements: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions. *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010). The plaintiff must also show a violation of his Fourth Amendment rights. *Id.* at 161.

"Although probable cause to arrest and probable cause to prosecute often are co-extensive, probable cause to arrest does not automatically carry over to preclude a malicious prosecution claim." *Torres v. City of New York*, No. 20-CV-4007 (BMC), 2022 WL 955152, at *8 (E.D.N.Y. Mar. 30, 2022) (citing *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a

reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).

Here, Plaintiffs allege that "[t]he RPD officers knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest and prosecute Plaintiffs." Am. Compl. at ¶ 404. However, aside from conclusively asserting that the RPD officers gave "false and fabricated evidence" to prosecutors, Plaintiffs allege no plausible facts that could lead to the conclusion that the RPD officers were doing anything other than citing Plaintiffs for a violation of the lawful Emergency Order. Accordingly, Plaintiffs' sixth and seventh claims must be dismissed.

False Imprisonment / Conditions of Confinement

In Plaintiffs' ninth claim for relief, they allege that they were falsely imprisoned and confined in conditions that "violated their rights to due process of the law, were knowingly and objectively punitive, with no rational relationship to any lawful purpose for which Plaintiffs were being detailed." Am. Compl. at ¶ 436. The false imprisonment element of the ninth claim for relief must be dismissed for the same reasons as articulated in the false arrest section above. *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("The common law tort of false arrest is a species of false imprisonment . . . .").

A pretrial detainee's claims of unconstitutional conditions of confinement, on the other hand, are evaluated under a different standard. The Second Circuit has made clear that under the Due Process Clause of the Fourteenth Amendment, "[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner— neither cruelly and unusually nor otherwise.'" *Benjamin v. Fraser*, 343 F.3d 35, 49–50

(2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009). A pretrial detainee may establish a § 1983 claim for unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions. *Benjamin*, 343 F.3d at 50. This means that a pretrial detainee must satisfy two prongs to prove a claim: (1) an "objective prong" showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and (2) a "subjective prong" showing that the officer acted with at least deliberate indifference to the challenged conditions. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

To establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health . . . which includes the risk of serious damage to physical and mental soundness." *Darnell*, 849 F.3d at 30 (internal citations and quotation marks omitted). The Second Circuit recently reiterated that the proper lens through which to analyze allegedly unconstitutional unsanitary conditions of confinement is with reference to their "severity" and "duration," not the detainee's resulting injury. *Willey v. Kirkpatrick*, 801 F.3d 51, 66–68 (2d Cir. 2015).

In the present case, Plaintiffs allege that "Defendants acted with deliberate and reckless indifference toward Plaintiffs' health, safety and medical needs" (Am. Compl. at ¶ 437) when they removed Plaintiffs' protective face masks "exposing them to great risk of contracting the deadly COVID-19 virus" (Am. Compl. at ¶ 432), touched Plaintiffs' faces with their soiled hands (Am. Compl. at ¶ 433), and "packed Plaintiffs into three crowded

transport vans for prolonged periods of time" (Am. Compl. at ¶ 434). As a result of this deliberate indifference, Plaintiffs allege that Plaintiff Taylor Howarth "did in fact contract COVID-19." Am. Compl. at ¶ 435.

The Court finds that Plaintiffs have not established a due process violation based on their conditions of confinement. The crux of Plaintiffs' argument in this regard is that they were at "extreme risk of infection by COVID-19" while detained following the protest. (Dkt. 9 at ¶ 49). However, there are no allegations that any of the Plaintiffs have a medical condition that places any of them at high risk of serious illness should they contract COVID-19. "Courts that have found that [plaintiffs] suffer from a serious medical need for purposes of the deliberate indifference analysis in the context of the COVID-19 pandemic have done so only for detainees suffering from conditions recognized by the Centers for Disease Control and Prevention ("CDC") as placing individuals at higher risk of severe illness." *McDonald v. Feeley*, 535 F. Supp.3d 128, 140 (W.D.N.Y. 2021) (collecting cases). Because Plaintiffs have not made such a showing, they have not demonstrated deliberate indifference to a serious medical need, and the conditions of confinement claim fails.

Accordingly, Plaintiffs' ninth claim for relief must be dismissed.

Due Process / Void for Vagueness

In their tenth claim for relief, Plaintiffs argue that Defendants enforced the Emergency Order "in a manner that rendered it constitutionally void for vagueness and/or overbroad, such that its enforcement against Plaintiffs violated their due process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or

26

reflected the absence of adequately clear standards to guide police officials' . . . discretion

. . . without fair warning to Plaintiffs." Compl. at ¶ 443.

As another court in this Circuit has explained:

> The void-for-vagueness doctrine requires that a penal statute define a criminal offense (1) "with sufficient definiteness that ordinary people can understand what conduct is prohibited" and (2) "in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (quoting *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013)). The touchstone of the first prong — the notice prong — "is whether the statute [or regulation], either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal," while "[t]he arbitrary enforcement prong requires that a statute give 'minimal guidelines' to law enforcement authorities." *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (first quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997), and then quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). "Although a law must provide explicit standards, it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Id*. (quotation omitted).

*Butler*, 559 F. Supp.3d at 271.

Plaintiffs' assert that the statute fails to meet a heightened standard for speech regulations because it "provides no guidance on what constitutes a 'group[] of five or more' people in a public place." Mem. in Opp. at 24 (citing, *inter alia*, *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). They even point to the conduct of fellow protester Tarik Grandoit, who on the evening in question "asked several officers how far away from the group he had to stand to not be arrested . . ." and received no answer. Am. Compl. at ¶ 69. However, Plaintiffs' assertions and arguments are not adequate to show the Emergency Order was void for vagueness.

As Plaintiff notes, in a different case and under a separate standard of review, the Court has previously found that "the term 'group' is clear and unambiguous, and . . . the

order provides people of common intelligence with clear notice of what is prohibited." *Martin v. Warren*, 482 F. Supp.3d 51, 79 (W.D.N.Y. 2020). Nothing in Plaintiff's complaint would lead the average person of ordinary intelligence to a different conclusion. *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2605 (2020) (*Alito, Thomas, Kavanaugh, J., dissenting*) ("In times of crisis, public officials must respond quickly and decisively to evolving and uncertain situations . . . . Thus, at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules."). The Court concludes that the terms of the Emergency Order provided adequate notice to people of common intelligence, and provided law enforcement authorities with the minimal guidelines necessary to satisfy the arbitrary enforcement prong.

Accordingly, Plaintiffs' void for vagueness claim must be dismissed.

Equal Protection

In their eleventh claim for relief, Plaintiffs allege an equal protection claim on the basis that "Defendants enforced the [Emergency Order] in a malicious and selective manner against Plaintiffs in violation of Plaintiffs' rights to enjoy equal protection of the laws . . . . did not enforce the [order] against others similarly situated . . . . [and] implemented the [order] for a discriminatory purpose . . . ." Am. Compl. at ¶ 448–451.

In order to state an Equal Protection claim, a plaintiff must allege "(1) [plaintiff] was treated differently from other similarly-situated individuals; and (2) the differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure." *Louis v. Metro. Transit Auth.*, 145 F. Supp.3d 215, 227 (E.D.N.Y. 2015) (quoting

*Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 110 (2d Cir.2006) *overruled in part on other grounds by*, *Appel v. Spiridon*, 531 F.3d 138 (2d Cir.2008) (quotation omitted)). To satisfy the first prong, a plaintiff must identify a "similarly situated comparator," and show that she was treated differently than that comparator. *Geller v. Cuomo*, 476 F. Supp.3d 1, 19 (S.D.N.Y. 2020). District courts in the Second Circuit are split regarding the definition of "similarly situated." *Louis*, 145 F. Supp.3d at 227 (citation omitted).

Even under the least stringent standard, Plaintiffs have not proffered evidence of a similarly situated comparator. They merely recite a litany of wrongs, many of which – as discussed above – are insufficiently or implausibly pled. Thus, Plaintiffs' selective treatment theory fails, and the equal protection claim must be dismissed.

<u>Declaratory Relief</u>

In their twelfth claim for relief, Plaintiffs argue that under 42 U.S.C. § 1983, they are entitled to declaratory relief in the form of a Court order declaring Defendant Warren's "Local Emergency Order" to be unconstitutionally vague. Am. Compl. at ¶ 456. In their thirteenth claim for relief, Plaintiffs argue that they are entitled under 28 U.S.C. § 2201 to a declaration from this Court declaring the order to be unlawful and a violation of the First and Fourteenth Amendments. Compl. at ¶ 458–59. Defendants argue that this claim must be dismissed because the emergency order has expired and Defendant Warren is no longer in office, and hence there is no longer a case or controversy that such relief could redress. Mem. in Support at 8–9. The Court agrees.

"Article III's case-or-controversy requirement subsists through all stages of federal judicial proceedings. It is not enough that a dispute was very much alive when suit was

filed." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 461 (2007) (internal

quotation marks, ellipsis, and brackets omitted).The Second Circuit has explained that

> [t]he case-or-controversy limitation on our jurisdiction, and its focus on parties' stakes in the action, manifests in three distinct legal inquiries: standing, mootness, and ripeness . . . "[S]tanding doctrine evaluates a litigant's personal stake as of the outset of litigation." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001) . . . . Mootness doctrine determines what to do "[i]f an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation" after its initiation. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (internal quotation marks omitted) . . . .

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018)

(some internal citations omitted). "The voluntary cessation of allegedly illegal activities will

usually render a case moot if the defendant can demonstrate that (1) there is no

reasonable expectation that the alleged violation will recur and (2) interim relief or events

have completely and irrevocably eradicated the effects of the alleged violation." *Mhany*

*Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (citation omitted). "A

defendant satisfies its burden where it shows that the possibility of recurrence is merely

'speculative.'" *Dark Storm Indus. LLC v. Hochul*, No. 20-2725-CV, 2021 WL 4538640, at

*1 (2d Cir. Oct. 5, 2021) (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of*

*Educ.*, 397 F.3d 77, 88 (2d Cir. 2005)).

Here, although Defendants refer to standing, they are not alleging that Plaintiffs

lacked a personal stake in the outcome of the action at its commencement. Rather, they

contend that intervening circumstances – the expiration of the order, and Defendant

Warren's leaving office – have rendered Plaintiffs' claims moot. *See Lewis v. Cuomo*, No.

20-CV-6316 CJS, 2021 WL 5827274, at *8 (W.D.N.Y. Dec. 8, 2021). The Court finds that

in citing these intervening circumstances, Defendants have met their burden of demonstrating that the possibility of recurrence of the Emergency Order is merely speculative. "Particularly in view of the mitigation measures that have become available to combat the spread of COVID-19, and the providential infrequency of pandemics," there is an extremely low risk that such a prohibitive Emergency Order will recur. *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 446 (2d Cir. 2021).

Even if Plaintiffs did have standing, they would not be entitled to the declaratory relief they seek for the reasons stated above, and because they have failed to plausibly allege that the Emergency Order is void for vagueness. Accordingly, Plaintiffs' twelfth and thirteenth claims for relief are dismissed. *See also Lamar Advert. of Penn, LLC v. Town of Orchard Park, New York*, 356 F.3d 365, 379 (2d Cir. 2004).

Municipal Liability

Having considered Plaintiffs' claims for relief under federal law, the Court returns to Plaintiffs' first claim for relief, in which they broadly allege a § 1983 claim for "municipal liability." It is well-settled that 42 U.S.C. 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n. 3 (1979). For claims under § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir.1999) (citation omitted). As defendants rightly point out, although *Monell v. Department of Social*

*Services*, 436 U.S. 658 (1978) allows for claims to be brought against a municipality in certain circumstances, *Monell* does not provide a separate cause of action absent an "independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Because there was no independent constitutional violation in this case, Plaintiffs' *Monell* claim must be dismissed. *Butler*, 559 F. Supp.3d at 273.

Supplemental Jurisdiction

28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, the district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction," and the court determines that retaining jurisdiction would not promote the values of economy, convenience, fairness, and comity. *See* 28 U.S.C. § 1367(c); *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (discussing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . judicial economy, convenience, fairness, and comity . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 302 (2d Cir. 2003).

In the present case, the Court has thoroughly considered Plaintiffs' complaint and papers, and concluded that they have failed to plausibly allege any federal claims, or a

state law claim for false arrest or malicious prosecution. Further, the Court finds that it would not serve the values of judicial economy, convenience, fairness and comity to retain supplemental jurisdiction over the remaining state law claims of assault and battery, and violation of New York Civil Rights Law § 79-P. Therefore, the Court dismisses the case entirely. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988).

## CONCLUSION

The Court finds that Plaintiffs' complaint does not contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. Consequently, it is hereby,

ORDERED that Defendants' motion to dismiss the amended complaint [ECF No. 13] is granted with respect to Plaintiffs' first through thirteenth claims for relief; and it is further

ORDERED that Plaintiffs' remaining state law claims of assault and battery and violation of New York Civil Rights Law § 79-P are dismissed under 28 U.S.C. § 1367(c).

The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:     July 15, 2022
           Rochester, New York

ENTER:


CHARLES J. SIRAGUSA
United States District Judge

33